May it please the court. Again, my name is Craig Denny. I represent Hugo Moreno-Sanabria Council. Your Honor, this was a drug conspiracy case that prosecuted in the District of Nevada. And during trial, there was a unindicted co-conspirator by the name of Michelle Moroney who did not testify despite our best efforts to get her on the witness stand. And the government introduced, and the court admitted, Government Exhibit 20, which was a plea agreement from State Court of Ms. Moroney, which stated, quote, I did willfully, unlawfully, knowingly conspire and agree with Hugo Moreno-Sanabria to sell a Schedule I-controlled substance to methamphetamine at a location in Reno, Nevada, and this was on May 10th of 2011. That was the same transaction that the government had in the superseding indictment at the Federal jury trial. And we believe that the admission of that evidence, that plea agreement, was prejudicial – extremely prejudicial to my client and would constitute reversible error in this case. And contrary to the government's arguments that there was no proper objection made, I made a clear objection that, quote, my position is the plea agreement is not a statement of the co-conspirator. This is an agreement between her counsel and the district attorney's office. And I acknowledge my objection did not say, this is not a statement of a co-conspirator made during and in the furtherance of a conspiracy. But I think the objection was that the plea agreement is not a statement of a co-conspirator. And I think it was quite clear that our objection was that this – this plea agreement that was being offered did not set – did not qualify under Federal rule of evidence 801d2e. And the, you know, the Court's was very clear that that was the grounds that the Court was actually admitting that plea agreement on into evidence at the trial. And I would state that the, you know, if the standard review is – is harmless error, we should win on this. If the standard review of the Court believes that the objection was not thorough enough, even on a plain error standard, I believe that it would be – this case should be reversed on it. The case that I cite, I did not find any Ninth Circuit case law that was directly on point in this, but I cited the objection of a guilty plea of a non-testifying co-defendant at trial, and the Court reversed the convictions of the defendant at trial on a plain error standard. And in this case, the challenge that the defense had throughout the trial is the government is essentially presenting its case using informant evidence through Ms. Moroney, who they dispute as an informant. And so, you know, in this case, Ms. Moroney was not a co-defendant, but she was a co-defendant and she clearly provided information to the DEA. So if you want to call her a confidential source, cooperating witness or what have you, she was, you know, essentially an informant, maybe not taking directions directly from the DEA agents. But then you had these other – Scalia. Excuse me. Verrilli,, Yes, sir. Scalia. Does the law differentiate between a precipient, confidential informant and one who is a co-defendant? Verrilli, I have to check that for you. Can you hear me now? Verrilli, Yes, sir. Scalia. Okay.  Is there a problem, though? Verrilli, Yes. Go ahead. We can hear you. I think you can hear me. Scalia. Doesn't the law distinguish between someone who is a precipient, involved, confidential, reliable informant and one who merely observes things and then gives you the law enforcement, the proverbial tip? Doesn't the law differentiate between those two? Verrilli, They do, Your Honor, and I think that would Scalia. Which one was this, then? Verrilli, Well, with respect to Michelle Maroney, I don't believe that she was merely a tipster, Your Honor. I think the reference to the government's argument at trial, the tipster was the confidential source number one, who is the unnamed, unidentified witness. But with respect to Ms. Maroney, they weren't characterizing her as a tipster at trial. She was a unindicted co-conspirator, and one of the specific drug offenses in the Federal indictment was this May 10, 2011, transaction that she was at, and the government's position was that she participated as an unindicted co-conspirator. And then this plea agreement is offered where essentially they're telling the jury through the statement in the plea agreement that I conspired with Mr. Moreno. I don't see how the jury could not consider that as evidence of guilt of Mr. Moreno on the drug conspiracy count, notwithstanding any type of limiting instruction that the Court would give. With respect to the Court's question, I think that goes to the other issue that we had raised about the nondisclosure of confidential source number one. And I think the dispute we have, and when I look at the cases, the Roviario case as well as the Gonzalo Beltran case, where they're talking about these factors on whether or not the disclosure of this source or this informant's identity is relevant, and these factors are what is the degree of involvement in the criminal activity. Well, in the present case, there was evidence presented through the DEA agent that confidential source number one was the individual that turned them on to the apartment at 4205, Apartment 3C in Reno, where Mr. Moreno and Mr. Rodrigo's name was on the lease. She actually went there at the direction of the DEA to pick up his – try to get Mr. Moreno's new cell phone number. But she also, on top of that, participated in one of the drug transactions with – it was a one-ounce buy with the co-defendant, Mr. Rodrigo Becerra. So I don't think she would fall into that category that she's just merely a tipster. She's actually – her information is being brought out by the DEA agent at trial through the DEA's testimony. And the only thing that we could do to challenge her before the jury was to point out that she herself had been arrested for drug trafficking, methamphetamine. She was paid some money for her cooperation, and that she – the charges were ultimately dismissed against her. And our theory of the case at trial, Your Honors, was we believed that this other informant, unindicted co-conspirator, Ms. Moroni, was the individual who was responsible for the – the quantity of drugs that was found in the apartment. She had resided there. She had resided in the bedroom, along with another man named Aaron Romero. And I wanted to be able to cross-examine this confidential source number to one to find out if she's involved in the drug trade and she's going to this apartment at the request of the DEA. Is Michelle Moroni there? Did she buy drugs from Michelle Moroni? A variety of questions I think that would have been very relevant and helpful to our defense for Mr. Moreno at trial, to basically bring that evidence out and question this informant. But the challenge we had is we didn't know where she was. Sotomayor, you're making a much clearer challenge here, I think, than you did in your brief regarding CS1. Is that what you're talking about? Yes. Yes, Your Honor. So – because it seemed unclear to me from your opening brief whether you were making the argument that the district court erred in failing to compel the government to disclose CSS1 identity. Is that what you're – Yes, Your Honor. Okay. Because you're supposed to make specific and cogent arguments in the opening brief or else, you know, we don't address them. And you mention disclosure in your heading on page 8, but I see no cogent argument about disclosure. You just state that the district court should have compelled disclosure. Also, you don't mention disclosure in the issues presented section of your brief. That's the blue brief. Is that you, the blue brief? Yes, Your Honor. I've – And you don't cite a single case on the standard governing disclosure of a confidential informant. And it seems like both are required under the appellate rules. So I'm just trying to figure out if you haven't waived that. I – even if we get to the substance, I just want to make sure you haven't waived that. Well, I guess, Your Honor, are you – I want to make sure you're looking at Mr. Moreno's brief. Oh, no. I'm looking at Mr. Rodriguez-Posero's brief. Okay. Yeah. Okay. I am representing Mr. Moreno in my brief, Your Honor. I thought you were doing both of them, but anyhow, go ahead. I apologize for the clarification. In my brief, this issue that I'm raising here is addressed in the opening brief on pages 27, 28, 29, 30, and 31, laying out the discussion of the Gonzalo Beltran factors and the information that we would have hoped had we had the disclosure of CS1's identity, we could have, you know, called her as our own witness and cross-examined her. And it was – the challenge throughout the trial was I've tried a lot of Federal jury trials, and I've never had a case where I've been unable to cross-examine any of these informants, and in this case, there's two by the government, one unindicted co-conspirator. Yes, sir. I have a question, and that is, if CS1 is not a recipient, participating informant, I think the law says they are not subject necessarily to disclosure. If that's the case, how do you get to CS1? And I can understand your argument on CS2 and the plea agreement, but I'm having a little trouble with how you think you can force the government to produce someone that under the law may not be producible. Well, Your Honor, the – there was evidence presented at trial through the DEA agent that CS1 actually was a recipient participating witness in one of the drug transactions with the co-defendant, Mr. Rodrigo. And the way that affects my client is Mr. Moreno-Sanabria is charging a conspiracy with a 10-year mandatory minimum based on the drug quantity. So she was more than just saying, these guys are dealing drugs in this apartment 3C. Okay. I have another question. And again, I'm unclear on the record, and maybe I missed it. Were the motions of the request to produce the informants part of any kind of a pretrial proceeding? The motion to disclose the informants or produce the informants for trial, was that a part of any pretrial proceeding? Your Honor, I found out at the beginning of trial that none of the informants were going to testify for my client. There was one informant who testified against the co-defendant, Mr. Becerra. That was the CS2, which was the male informant. And so basically in the morning of trial, I am advised that these transcripts and I'm not going to go into the details of this, but what I am advising you is that    And in the morning of trial, I am informed of there was a body wire of a transaction in which Michelle Maroney participated, as well as this confidential source No.   as well as this confidential source No. 1, which was the witness, Joy Taylor. And so there I was making the objections that we should be entitled to, one, have the witnesses produced, where we could find them. CS1, we didn't even know what her name was. And there's this key transaction, which is part of that unindicted co-conspirator plea agreement that gets read to the jury, put up on the screen, argued by the government at closing. This is a transaction that Ms. Maroney's in and Ms. Taylor's in, and essentially I'm limited in just cross-examining a DEA agent who's essentially saying that they're credible and everything was done up to snuff. There's just the fundamental unfairness of trying to defend this case with these essentially empty chair informants at trial where the DEA agents are essentially testifying, summarizing what cooperation they provided, and the scales simply got tipped too far with the government by introducing that plea agreement. Did you want to reserve two minutes? I will, Your Honor.  Good morning. May it please the Court. I'm Elizabeth Olsen-White for the United States Morning Council. With respect to the plea agreement with Ms. Maroney, yes, it shouldn't have been admitted. Why? Why did the government introduce? Well, I'll tell you what the government was thinking. Were you at the trial? No, I was not, but I've spoken extensively with the trial attorney about this. The defendant's theory at trial, starting with their opening statement, was that Michelle Maroney was the drug dealer here and the DEA, and she was deceiving the DEA, and that when she got in trouble, she threw Mr. Moreno-Sanabria under the bus to make the DEA think that he, rather than her, was the drug dealer. And this was sort of the overriding theory, was that the DEA was being deceived by Michelle Maroney. And so when the government got a hold of this evidence, I mean, in fact, the DEA wasn't being deceived. Law enforcement wasn't being deceived. She was being prosecuted. She was prosecuted in State court. She pleaded guilty. Under what rule of evidence did the prosecutor think that should come in? Well, she thought it came in under co-conspirator statement until she thought about it, you know, later that afternoon and thought, wow, this wasn't made during and further into the conspiracy. Of course it wasn't. And if anybody had ñ I mean, this is in the middle of trial. Did she move to correct the record? I'm sorry? Did she move to correct the record or ask the judge for an instruction to have that disregarded? I'm sorry. I said later that afternoon. I meant later. I don't ñ I don't know that this was ñ that she realized this during the trial. But the ñ You're saying she might have realized this during the trial? No, I don't ñ I don't think so. I'm saying that when I got the opening brief and I walked down to her and said, what about this plea agreement, she said, oh, yeah, I know, that shouldn't have come in. It happened during trial, in the midst of trial. If anyone, defense ñ either defense counsel or the judge or if the prosecutors themselves had said, wait a second, one of the requirements ñ there's two requirements for 801 D2E. One is that it's a statement by a co-conspirator. And second, that it's made further during and in furtherance of the conspiracy. How is this made during and in furtherance? If anyone had said that, the answer would have been, oh, of course. Of course it wasn't. Never mind. I mean, it just ñ that was not the objection that was made. And the objection that was made was that this wasn't a statement by Ms. Maroney. This is a plea agreement. This is a deal between her lawyer and the district attorney's office, even though she signed it. And what Mr. Denny said, in fact, just to ñ just to emphasize how no one was thinking about this other requirement, during and in furtherance of, Mr. Denny said, this plea agreement doesn't constitute a statement of Ms. Maroney, which you know could be established if we had a transcript of the plea ñ of the plea colloquy. So even he wasn't thinking ñ I mean, no one in the midst of trial was thinking during and in furtherance. And so it came in, and it shouldn't have come in, but frankly, under either standard of review, this is harmless, regardless of whose burden it is, whether it's plain error or harmless error. The particular statement ñ and it's actually harmless for two reasons. First of all, because it was ñ the statement was, I conspired with Mr. Moreno, right? And that's the ñ that's the challenge. That's the statement that shouldn't ñ shouldn't have been let in. The district court, because he admitted it as a co-conspirator statement, even though we realize that he shouldn't have, he gave the limiting instruction for co-conspirator statements. And the limiting instruction, which he gave twice, once is included in Mr. Moreno's excerpt of record, and then he gave a much ñ a longer, more detailed limiting instruction a little bit later, which we included in our supplemental excerpt. What he said was, if you find the jury, if you find that Mr. Moreno and Ms. Moroni were co-conspirators, then you can take this statement into account. But in making that initial determination of whether they were conspirators, you can't take this statement into account. So what the Court said is before you can even consider this statement, you can only consider this statement if you decide, based on other evidence, that these two were co-conspirators. So that means that if the jury took into account the statement, I conspired with Hugo, they had already decided that these two individuals were conspirators. And the reason that they clearly would have decided that is, this is about this May 10, 2001 transaction, which is not, by the way, charged as a substantive offense in the superseding indictment, but it was an overt act of the conspiracy. The jury saw the audio tape, I mean, heard the audio tape, saw the videotape. They heard the audio tape where Ms. Moroni, the confidential source calls Mr. Moreno-Sanabria, says, can we meet, can I get an ounce, using code words, of course, can I get drugs from you? He says, yes, meet at this parking lot. He shows up at the parking lot with Ms. Moroni. Ms. Moroni is serving as an interpreter, and this is clear on the audio tape. Mr. Moreno doesn't speak English. This Joy Taylor, this confidential informant doesn't speak Spanish. And so Ms. Moroni says, we're here, but you know he only brought a half an ounce, so he's got to go back and get the other half. Ms. Moroni stayed with Ms. Taylor while Mr. Moreno-Sanabria went back to the apartment on Neal Road, got the other half ounce, being tracked by law enforcement all the way so they knew exactly where he was going, came back and made the sale. Audio tape, videotape, testimony from the officers. There's just no question. I mean, this particular drug deal and the April 27th drug deal, which was the substantive charge against Mr. Rodriguez Becerra, those two, audio tape, videotape, witness testimony, photographs, I mean, it's all right there. So in terms of deciding, even under a harmless error, and I mean, I think the difference between plain error and harmless error is really whose burden it is, but under the harmless error standard, you know, you look at whether the evidence is cumulative, and I would say that based on the evidence that the jury had, and also in light of the judge's instruction that they couldn't consider the statement, I conspired with Hugo, unless and until they decided that Ms. Moreno or Ms. Moroni conspired with Hugo Moreno. It was by definition cumulative. And the other evidence against both defendants was really overwhelming. This was a five-and-a-half-month investigation that did include audio tape, videotape, surveillance, numerous witness testimony. It just simply could not have made a difference to this verdict. How about the can you address the confrontation clause argument on CS1, whether or not? Yeah. Well, CS1, and you made this point, Your Honor. I think that standing up, Mr. Denny said something about how he would have liked to cross-examine this witness about whether Michelle Moroni was in the apartment or this confidential source when she went to make the deal. I don't recall. I've read the record. I don't recall any such argument in the district court. I mean, the district court is we want to con to we should have a right for the jury to be able to test this person's credibility. That was the argument that was made in the district court. And what the district court did, and he did it six times, I mean, the district court gave six instructions saying because this person is here, who is not here, you cannot take anything that's reported about what this person said for the truth of what was asserted in that statement. Was there testimony, and how much was there? No, there wasn't. Well, there was testimony that CS1 gave Officer Mullen two nicknames and a phone number of these two guys living at this apartment on Neal Road. And that is what started the investigation. That is why. And, in fact, I mean, the trial testimony wasn't even that the CS gave him two names of people who were dealing drugs. The testimony was a confidential informant gave us a phone number and two nicknames of two gentlemen living at this apartment on Neal Road. And so we started investigating. And that started the five-month investigation. The first thing they did was identify him because all they had was the nicknames. So they got these two individuals' names. And then they did send CS1, there was testimony from the officer about CS1 going in and buying an ounce of methamphetamine from Mr. Rodriguez Becerra. What the officer, I'm sorry? I have a quick question. Is it DEA's policy these days if they get information of two nicknames and an address that they begin an investigation with nothing more? Well, Detective Mullen testified that there had been a task force operation focusing on that area of Reno. They had a number of investigations going on. And so I'm not sure in what context this confidential informant had given them this information, but they were involved in a number of investigations about methamphetamine trafficking in that particular neighborhood just south of the airport in Reno. The officer testified that they sent this confidential source in to get to buy drugs from Mr. Becerra. And he testified about how that's done, about how they searched the person beforehand to make sure they don't have any contraband on them, fitted them with a recording device, listened as she went in. When she came out about ten minutes later, she gave the officer the drugs. I mean, she took in $1,000 and she came out with the drugs. The officer testified that he listened to the recording, the body wire that she was wearing, and that he heard two voices. He heard the confidential source number one and that he heard Mr. Rodriguez Becerra. Specifically, he testified that he did not hear Mr. Moreno-Sanabria's voice on this call. So to the extent that there's an issue here at all, and I don't think there is, it's an issue with Mr. Rodriguez Becerra only, not with Mr. Moreno-Sanabria. But I will say that with respect to that, not only did the judge give a cautionary instruction six times, and that's on excerpt of record 1535. Oh, I've got my pages mixed up. I'm sorry. But he actually explained, he actually gave a very good explanation. I mean, a lot of times a district court judge in the rush of trial will just say, okay, I'm going to admit this, but not for the matter of the truth asserted. And I don't know how many jurors really understand what that means. He explained, he said, listen, I want to explain this to you. This individual is not here, and therefore, you have no way of testing the credibility of you. You are not seeing this person for yourself. You cannot test whether or not what they're saying is true. And for that reason, you can't take anything that they said as true. I mean, there's some information about this person that's providing context for what the officer is testifying, but you cannot take as true anything that is conveyed about what this person said because they're not here and you're not in a position to judge their credibility. I mean, the judge gave that at 36, 37, again at page 100, and then an excerpt of record at 56 and 57. Over and over, the judge made clear that this confidential informant number one was not – there's no issue of this person's credibility because nothing that that person said can be taken as true. And – Even though he was acting on – he was providing the information that the government was acting on. Yes. I mean, in terms of the first thing about the names and the nicknames and the phone numbers, that's just to give an explanation for why the DEA started this investigation. They started this investigation. They identified these people. After the one drug deal from CS1, the other – CS1 went in one other time because he called – she, I'm sorry, called Rodriguez Becerra. Moreno-Sanabria answered the phone. The DEA didn't have – you know, they use disposable phones, and so they needed a new phone number. So she went in, not to buy drugs, but just to get the new phone number from Moreno-Sanabria. But then the other – but the other two, CS2, who did the April 27th deal with Mr. Rodriguez Becerra, he testified at trial, and the court sealed the courtroom for that particular witness. And then the May 10th, Joy Taylor was – she was identified to the defense, but she was not called as a witness. The officers who monitored that transaction testified, and they – again, as I say, I mean, they provided audio and video and photographs and their live testimony. With regard to Mr. Rodriguez Becerra's sentence, was that – there's a claim on appeal that it was unreasonable. That sentence was well within the district court's discretion. It was 131 months, I think, or it was 32 – 11 years. He said 11 years. The mandatory minimum was 12 – or it was 10. The guideline range was 121 to 151. This is a little bit of a – kind of a low, middle sentence based on the district court's finding that this was a significant organization that trafficked a lot of methamphetamine in Reno. Judge McAmey, do you have any other questions for counsel? No, thank you. Okay. Thank you. Thank you. Thank you, Your Honors. With respect to the – the confidential source number one, I would direct the Court's identification or, to the record, the excerpt from Mr. Hugo Moreno-Sanabria where the pages are from 52 through – I guess it was 51 through 54, where I'm trying to articulate for the Court the reasons that we wanted to have the identity of CS1. You know, because of the judge – or the drug conspiracy that was charged in this case triggering the 10-year mandatory minimum, that evidence that was being brought in, including the hand-to-hand transaction that CS1 participated with the co-defendant, Mr. Rodrigo Becerra, that had an impact on my client as well. And we wanted to – I pointed out to the Court that we wanted to basically – went to our right to present a defense and cross-examine the witnesses for motives of bias. And the fact that this was not just merely a tipster, this was an informant who gave information about the residents and the individuals who were selling drugs. And when the – when the government at trial – this was outside of the presence of the jury – summarized the information that had been provided by CS1, she referenced that this individual was aware of two individuals selling methamphetamine out of 4205 Neal Road, gave their names, their apartment address, and descriptions of the vehicles. And that's the supplemental excerpt to record, page 51. And then goes further, where she's actually participating in a transaction with the co-defendant. So I think the – the disclosure should have been made, and on top of that, we made the right of confrontation argument that we wanted to be able to cross-examine this witness for our theory of the case, that she might have very well said it was Michelle Moroney, who was the drug trafficker. And very quickly, with respect to the plea agreement, the May 10th transaction for that plea agreement that the government offered into evidence, believing that it was a co-conspirator statement, which it clearly was not, that was evidence that the government directly presented at trial. They played this very, you know, hard-to-hear audio tape where you couldn't see my client anywhere on it, saying that Michelle Moroney, the unindicted co-conspirator, and the DEA informant, Joey Taylor, did this transaction on May 10th. So it wasn't just some passing evidence. I mean, this was evidence of the conspiracy. And then they introduced the plea agreement. And I would respectfully dispute the fact that the objection was not made properly. Supplementary of record, page 122, I stated, My position is the plea agreement is not a statement of a co-conspirator. This is an agreement between our counsel and the district attorney's office. And the government concedes now on appeal here that the U.S. attorney at trial thought it was a co-conspirator statement. She thought it should have come in. And that's what the grounds that the judge let it in. It was, if the standard of review is harmless or plain error, it was something that was clearly improper and overreached in this case. Yeah. All right. Thank you very much. Thank you very much, Your Honor. Thank you both for your arguments. And the case is now submitted. And we are in recess. Thank you very much. Thank you.
judges: McNamee, Schroeder, Murguia